IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TIFFANY HARRIS and AMBROSE LEE,
Individually and as personal representatives of
Gabriel Lee, deceased,

    Plaintiffs,

vs.                                                                                          Civ. No.  06-412 JP/KBM

UNITED STATES OF AMERICA,

    Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

    This is a medical malpractice case brought under the Federal Tort Claims Act.  It is a sad case involving the death of a four month old child, Gabriel Lee.  From September 5, 2007 to September 7, 2007, the Court held a bench trial.  Guy Dicharry and Stephen Moffat represented Plaintiffs; Assistant United States Attorneys Jan Mitchell and Elizabeth Martinez represented the Defendant.  The Court requested post-trial briefing and subsequently held a post trial hearing on December 11, 2007.

    The Court has heard the testimony of witnesses; reviewed the exhibits accepted into evidence at trial; heard the oral arguments of counsel both at the bench trial and at the post trial hearing; considered the parties' post trial briefs; and reviewed the trial pleadings and relevant law.  In accordance with Fed. R. Civ. P. 52, the Court now makes the following Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

*A. Factual Background and Events*

Plaintiffs Tiffany Harris and Ambrose Lee are the parents of Gabriel Lee. Victoria Harris is the mother of Plaintiff Tiffany Harris and the maternal grandmother of Gabriel. During the afternoon of March 18, 2005, Victoria Harris baby sat four month old Gabriel while Plaintiff Tiffany Harris was at work.[1] Tr. 88-89. When Victoria Harris picked up Plaintiff Tiffany Harris from work later that day at about 4:00 or 4:30 p.m., Victoria Harris reported to Plaintiff Tiffany Harris that Gabriel had had one bout of diarrhea. Tr. 89, 201. Gabriel was fed Pedialyte and baby formula that afternoon. Tr. 89. Gabriel had another bout of diarrhea that day between 4:00 p.m. and 8:00 p.m. Tr. 89, 203. Plaintiff Tiffany Harris also gave Gabriel Pedialyte and baby formula sometime between 4:00 p.m. and 8:00 p.m. Tr. 203.

Around 8:00 p.m. the evening of March 18, 2005 Plaintiff Tiffany Harris took Victoria Harris to her job. Tr. 90-91, 203. Plaintiff Tiffany Harris then picked up Victoria Harris from her job at about 11:00 p.m. and went to Victoria Harris' home for the night. Tr. 206. Gabriel did not have diarrhea between 8:00 p.m. and 11:00 p.m. that evening. Tr. 206. Gabriel, however, had one more bout of diarrhea during the night. Tr. 203. Plaintiff Tiffany Harris continued to feed Gabriel Pedialyte and baby formula during the night of March 18, 2005. Tr. 92, 209, 212. Victoria Harris also helped take care of Gabriel that night because Gabriel was crying a lot and had a hard time sleeping. Tr. 92-93. Plaintiff Tiffany Harris did not remember Gabriel having more than the one bout of diarrhea during the night of March 18, 2005. Tr. 94.

---

[1]Plaintiff Tiffany Harris and Gabriel were living with Victoria Harris at this time. Tr. 87. Plaintiff Ambrose Lee, Gabriel's father, lived elsewhere. Tr. 430-31.

Plaintiff Tiffany Harris decided to take Gabriel to the Emergency Room at Northern Navajo Medical Center (NNMC) the next morning March 19, 2005 at about 6:00 a.m. because Gabriel was fussy, had a fever, and the previous day and night had bouts of diarrhea. Tr. 93-94, 213. On the way to NNMC, Plaintiff Tiffany Harris fed Gabriel more baby formula and Pedialyte while Victoria Harris drove. Tr. 215-16. Plaintiff Tiffany Harris and Gabriel arrived at the Emergency Room at NNMC just before 8:00 a.m. Tr. 216. At that time, Plaintiff Tiffany Harris saw registered nurse Edwin Burton for triage purposes.

Nurse Burton noted on the Patient Care Component (PCC) Ambulatory Encounter Record that Gabriel was being seen for fever, nausea, vomiting, and diarrhea since the previous evening.[2] Tr. 506, Ex. 2. Nurse Burton also noted a "slight elevation in temperature," a pulse rate at the "high end of normal," and a respiratory rate also at the "high end of normal." Tr. 506-07. In addition, Nurse Burton noted that Gabriel was alert, moist, pink, and clear. Ex. 2, Tr. 507-09. Nurse Burton recalled at the bench trial that Gabriel's diaper was clean and that there was no sign of what he called "morbid" diarrhea upon taking Gabriel's rectal temperature. Tr. 510. After having examined Gabriel, Nurse Burton referred Gabriel to the urgent care clinic at NNMC instead of keeping him in the Emergency Room. Nurse Burton made this referral because he did not think Gabriel was dehydrated. Tr. 512. The urgent care clinic opened at 8:00 a.m. Tr. 531. While waiting to be seen at the urgent care clinic, Plaintiff Tiffany Harris fed Gabriel more baby formula and Pedialyte. Tr. 222-23.

Physician Assistant Douglas Shaffer saw Gabriel at the urgent care clinic at approximately 10:00 a.m. Tr. 534. Before Mr. Shaffer saw Gabriel, a nurse's aide weighed

---

[2]The parties agree that there was no evidence of vomiting. Tr. 294.

Gabriel and noted on the PCC Ambulatory Encounter Record that Gabriel weighed 8.9 kg. Ex. 2, Tr. 532. Also prior to examining Gabriel, Mr. Shaffer would have reviewed the medical record for Gabriel's previous visit to NNMC which was a well baby visit four days earlier on March 15, 2005. Tr. 534. Gabriel weighed 9.08 kg at the well baby visit. Ex. 3. Mr. Shaffer did not find the discrepancy in Gabriel's weight between the March 15, 2005 and March 19, 2005 visits significant because Gabriel was weighed on another scale for the well baby visit which could have been calibrated slightly differently from the urgent care clinic scale. Tr. 535. Mr. Shaffer would have also reviewed Nurse Burton's findings. Tr. 534.

Plaintiff Tiffany Harris told Mr. Shaffer that Gabriel had had a fever and diarrhea for a day and that Gabriel was fussy. Ex. 2. Plaintiff Tiffany Harris, however, was unable to state how many bowel movements Gabriel had in the last 12 hours. *Id*. Plaintiff Tiffany Harris also told Mr. Shaffer that Gabriel's appetite was mildly decreased. *Id*.

When Mr. Shaffer examined Gabriel he concluded that the elevated temperature indicated a viral illness, which most likely was viral gastroenteritis. Tr. 538. The pulse and respiratory rates could also have been elevated due to the fever although Mr. Shaffer conceded that elevated pulse and respiration rates are also consistent with dehydration. *Id*., Tr. 570. Mr. Shaffer observed that if Plaintiff Tiffany Harris was unable to count bowel movements because they were too numerous, he would have noted that on the PCC Ambulatory Encounter Record. Tr. 541. Moreover, Mr. Shaffer understood that Gabriel was still feeding, but ingesting only slightly less than usual. *Id*.

Mr. Shaffer noted on the PCC Ambulatory Encounter Record that Gabriel was alert, had a nontoxic appearance, and was under no acute distress. Ex. 2, Tr. 543. Mr. Shaffer's

examination included handling Gabriel's head to look in Gabriel's ears. Tr. 544. While looking in Gabriel's ears, Mr. Shaffer would have also observed Gabriel's anterior fontanelle (fontanelle).[3] Tr. 545. Mr. Shaffer does not note normal fontanelles in the medical record; he only notes abnormal ones. *Id*. Since Mr. Shaffer did not mention the fontanelle in the PCC Ambulatory Encounter Record, the fontanelle presumably appeared normal. Ex. 2. In examining Gabriel's ears, Mr. Shaffer did find that Gabriel had an infection in the right ear. Ex. 2, Tr. 545. Mr. Shaffer further examined Gabriel's nose including the mucus membranes in the nose. Ex. 2, Tr. 546. That examination was normal which indicated that the inside of the nose must have been moist. *Id*. In addition, Mr. Shaffer examined Gabriel's throat which Mr. Shaffer found to be clear. Ex. 2, Tr. 546-47. This finding also indicated that the mucus membranes in the throat were moist and normal. Tr. 547. Moreover, Mr. Shaffer found that Gabriel's lungs, heart rate, neck, and abdomen were all normal. Ex. 2, Tr. 547-49. Mr. Shaffer did not take a second set of vital signs because Gabriel's heart and respiration rates did not seem to have changed since the examination by Nurse Burton. Tr. 550. Finally, Mr. Shaffer noted that Plaintiff Tiffany Harris was "very impatient." Ex. 2.

Mr. Shaffer's final diagnosis was viral gastroenteritis and right ear infection. Ex. 2. Mr. Shaffer concluded that Gabriel was minimally ill. Tr. 554. Mr. Shaffer did not make a diagnosis of dehydration because Nurse Burton observed Gabriel to be pink and moist, and Mr. Shaffer's own examination did not disclose any dry mucus membranes but rather showed that Gabriel appeared alert and nontoxic, and that the abdominal examination was normal. *Id*. According to

---

[3]The fontanelle is the soft spot on the top of a baby's head where the skull has not yet formed. Tr. 38. The fontanelle appears shrunken when a baby is dehydrated. Tr. 40.

Mr. Shaffer, in his experience even mildly dehydrated babies are not pink, moist, alert, or nontoxic in appearance. Tr. 556. Mr. Shaffer's conclusion that Gabriel was not dehydrated was also supported by the fact that Gabriel was taking fluids and there was no history of "multiple, multiple bouts of diarrhea." Tr. 555. Although Mr. Shaffer admits that his written findings could be interpreted as indicating either no dehydration or mild dehydration, Mr. Shaffer would have written a diagnosis of dehydration on the PCC Ambulatory Encounter Record had Gabriel appeared to have been dehydrated . Tr. 581-82. Furthermore, if Mr. Shaffer thought Gabriel was dehydrated, he would have also written on the PCC Ambulatory Encounter Record that he instructed Plaintiff Tiffany Harris to follow up with a physician on March 21, 2005 or, if symptoms worsened, to follow up with a physician on March 20, 2005. *Id.*

Mr. Shaffer's treatment plan consisted of prescribing amoxicillin for the ear infection, Tylenol for the fever, and two oral rehydration salts (ORS) packages (makes two liters of solution) to continue to keep Gabriel hydrated over a 48 hour period. Ex. 2, Tr. 557-60, 573-74. It was the practice at NNMC to prescribe ORS packages for babies who experienced diarrhea but were not necessarily dehydrated in order to prevent dehydration. Tr. 558. When Mr. Shaffer saw Gabriel, he did not assume that Gabriel was deficient in chloride, potassium, or sodium, minerals and salts typically lost through dehydration. Tr. 559. Additionally, Mr. Shaffer would have instructed Plaintiff Tiffany Harris on how to administer the ORS packages, the amoxicillin, and the Tylenol. Tr. 559-61. Mr. Shaffer did not note in the PCC Ambulatory Encounter Record that he believed that Plaintiff Tiffany Harris had trouble understanding the medication instructions. Ex. 2. Consequently, Mr. Shaffer thought Plaintiff Tiffany Harris was able to follow the medication instructions. Tr. 562. Plaintiff Tiffany Harris also received counseling on

the medications from the NNMC pharmacy. Tr. 563.

In addition to instructing Plaintiff Tiffany Harris on how to administer these medications, Mr. Shaffer instructed Plaintiff Tiffany Harris to bring Gabriel back if she had "any concerns" about his health. Ex. 2. Mr. Shaffer does not give any more specific discharge instructions because specific instructions may limit when a patient would return for a follow up visit. Tr. 565. He would, however, have explained that if a baby stopped feeding, the baby's caregiver should be concerned and should bring the baby back for a follow up visit to prevent dehydration. Tr. 566.

Plaintiff Tiffany Harris and Gabriel finished the visit with Mr. Shaffer at about 11:00 a.m. Tr. 236. Before leaving the parking lot at NNMC, Plaintiff Tiffany Harris gave Gabriel more baby formula and Pedialyte. Tr. 237. Plaintiff Tiffany Harris and Gabriel then arrived at the Gold Star loan company at about noon to borrow money for Plaintiff Tiffany Harris' aunt, Cheyenne Redhouse. Tr. 101. At that point in time, Plaintiff Tiffany Harris thought Gabriel "looked pretty good" and observed that Gabriel was not fussy. Tr. 241. While at the Gold Star Gabriel drank more baby formula and Pedialyte as well as purified water. Tr. 241. Plaintiff Ambrose Lee also met Plaintiff Tiffany Harris at the Gold Star. Tr. 238. Plaintiff Ambrose Lee noted that except for a runny nose Gabriel looked "pretty healthy" and "normal." Tr. 431, 458. In fact, when Plaintiff Ambrose Lee played with Gabriel at the Gold Star Gabriel was happy and laughing. Tr. 454.

Plaintiff Tiffany Harris and Gabriel then left the Gold Star (without Plaintiff Ambrose Lee) and went to Ms. Redhouse's home at around 1:00 or 2:00 p.m. Tr. 101, Tr. 242. Plaintiff Tiffany Harris and Gabriel stayed at Ms. Redhouse's home until about 7:00 p.m. the evening of

March 19, 2005.  Tr. 246.  Between 1:00 p.m. and 3:00 p.m. that afternoon Plaintiff Tiffany Harris fed Gabriel baby formula and Pedialyte.  Tr. 242.  Gabriel was not feverish or fussy during the 1:00 p.m. to 3:00 p.m. time period nor did he experience any diarrhea during that time.  Tr. 243.  At about 3:00 p.m. Plaintiff Tiffany Harris napped with Gabriel at Ms. Redhouse's home for about two or two and a half hours.  Tr. 243.  At about 5:00 p.m., Plaintiff Tiffany Harris changed Gabriel's diaper and noticed that the "poop" in the diaper "was like still kind of runny, but kind of hard, still."  Tr. 244.  Plaintiff Tiffany Harris fed Gabriel more baby formula at that time but did not give him any Pedialyte.  Tr. 245.  After visiting Ms. Redhouse, Plaintiff Tiffany Harris and Gabriel went to Victoria Harris' home.  Tr. 246.  Shortly after arriving at Victoria Harris' home at around 7:10 p.m. to 7:50 p.m., Plaintiff Tiffany Harris went to bed for the night and left Gabriel in the care of Victoria Harris until about 8:00 or 9:00 a.m. the next morning, March 20, 2005.  *Id.*, Tr. 248.

Gabriel died at about 9:00 p.m. on March 20, 2005 as a result of a probable viral syndrome and dehydration.  Ex. 8, Tr. 158.

*B. The Opinion of Plaintiffs' Expert, Christopher Colwell, M.D.*

Dr. Colwell is an emergency room physician and teacher at the Denver Health Medical Center.  Tr. 31.  He is board certified by the American Board of Emergency Medicine.  Tr. 33.

Dr. Colwell could not determine Gabriel's hydration status from the information in the PCC Ambulatory Encounter Record.  Tr. 41.  Dr. Colwell, however, testified that a notation of "moist" which describes the state of mucus membranes and a notation of "pink" are not indicative of dehydration by themselves.  Tr. 65, 69.  Dr. Colwell also stated that notations of moist, pink, clear, alert, and alteration of temperature are not indicative of a child in distress but

they are also inconclusive regarding hydration status. Tr. 66-67. Moreover, Dr. Colwell testified that Gabriel's fever and pulse rate by themselves were not alarming. Tr. 74. Dr. Colwell further stated that he, like Mr. Shaffer, does not document every normal finding although Dr. Colwell would document in a potentially dehydrated child the appearance of the fontanelle and the result of a capillary refill test.[4] Tr. 67. In addition, Dr. Colwell testified that ORS packages or Pedialyte are used by physicians to prevent hydration as well as to treat dehydration. Tr. 73, 75. Dr. Colwell also noted that even though dehydration causes fever and higher pulse and respiration rates, Gabriel's fever could have likewise been caused by the ear infection and gastroenteritis, and that the higher pulse and respiration rates could have been caused by the fever. Tr. 37-38, 76.

In describing care options in this case, Dr. Colwell testified that if he felt that a baby was dehydrated, one of the care options would be to keep the baby at the hospital for an eight hour observation period. Tr. 71. An other option would be to bring the child back to the hospital. Tr. 72. Moreover, Dr. Colwell believed that in a case like this the medical provider should give the child's caretaker verbal and written instructions describing signs of dehydration. Tr. 46-47.

*C. The Opinion of Defendant's Expert, Robert Sapien, M.D.*

Dr. Sapien is board certified in pediatrics and pediatric emergency medicine. Tr. 260. He is the Chief of Division of Pediatric Emergency Medicine at the University of New Mexico Hospital (UNMH). *Id*. Dr. Sapien also sits on three national committees including the American Academy of Pediatrics committee on pediatric emergency medicine. Tr. 261.

Like Mr. Shaffer and Dr. Colwell, Dr. Sapien does not chart or document every normal

---

[4]A capillary refill test is used to determine hydration status. Tr. 40-41.

finding. Tr. 267. According to Dr. Sapien, signs of dehydration in a baby include sunken eyes, sunken fontanelle, dry mucus membranes, poor skin turgor, pale looking skin as opposed to skin which looks "pink," and tenting of the skin when pinched. Tr. 269. Dr. Sapien did not find Gabriel's vital signs to be "terribly concerning." Tr. 273-74. As with Dr. Colwell, Dr. Sapien stated that a fever can cause an increase in pulse rate. Tr. 276. Dr. Sapien further testified that a finding of "moist" is a "good indication of hydration" and that "pink" is a good indication of health. *Id*. Considering that Gabriel was observed as pink, moist, and alert, and that Gabriel had only a slightly elevated temperature as well as pulse and respiration rates, Dr. Sapien would not have been particularly worried about Gabriel. Tr. 277. Dr. Sapien observed that "dehydrated babies aren't moist and pink." *Id*. Also, Dr. Sapien stated that if a baby is moist, pink, and alert he would not expect a capillary refill test to be abnormal. Tr. 279. Under these circumstances, Dr. Sapien would have expected the fontanelle to be normal and that there would, therefore, have been no need for documentation regarding the condition of the fontanelle in the PCC Ambulatory Encounter Record. Tr. 342-43.

In addition, Dr. Sapien testified that checking for urine output in a diaper to determine hydration status would be problematic when the child is also having diarrhea. Tr. 330-31. Dr. Sapien noted that oral hydration salts are used to rehydrate babies as well as to prevent dehydration. Tr. 288. Dr. Sapien also testified that it is possible to have diarrhea but not be dehydrated. Tr. 327. Dr. Sapien concluded from the PCC Ambulatory Encounter Record that Gabriel was "minimally ill" and not dehydrated when he was at the NNMC urgent care clinic on March 19, 2005. Tr. 285, 288.

Since Dr. Sapien determined that Gabriel was just "minimally ill," Dr. Sapien concluded

that there would be no reason to keep Gabriel for observation for six to eight hours.  Tr. 289.

Furthermore, Dr. Sapien would not have asked Plaintiff Tiffany Harris to come back for a

recheck unless Gabriel got worse.  Tr. 292.  Finally, although Dr. Sapien did not think that the

discharge instruction to follow up if there were "any concerns" was a great instruction, it is,

nonetheless, a common practice to give such an instruction.  Tr. 290.  Dr. Sapien also observed

that other information is usually given verbally to the patient which is not necessarily

documented in the medical record.  *Id*.  Dr. Sapien further testified that although physicians at

UNMH give patients standardized written discharge instructions in cases of dehydration, not all

medical facilities have written discharge instructions.  Tr. 323, 342.

*D.  Gabriel's Hydration Status the Morning of March 19, 2005*

     A critical factual contention in support of Plaintiffs' medical malpractice case against

Defendant is that Gabriel was dehydrated the morning of March 19, 2005 when he was seen by

Nurse Burton and Mr. Shaffer.  Plaintiff has "the burden of proving every essential element of

the claim ... by the greater weight of the evidence."  UJI 13-304, NMRA 1998.[5]  "To prove by

the greater weight of the evidence means to establish that something is more likely true than not

true."  *Id*.

     In this case, the greater weight of the evidence does not support a finding that Gabriel

was actually dehydrated on March 19, 2005 during his visit to NNMC.  Although Gabriel had

approximately three bouts of diarrhea prior to seeing Mr. Shaffer on March 19, 2005, Gabriel

continued to take in liquids, albeit in amounts slightly less than usual, from the afternoon of

---

[5]The law of the State of New Mexico applies in this case.  28 U.S.C. §1346(b)(1); 28 U.S.C. §2672.

March 18, 2005 until just before being seen at the NNMC urgent care clinic the next morning. Those liquids included Pedialyte which aids in preventing dehydration. Moreover, it is possible for a child to have diarrhea but nonetheless take in a sufficient amount of liquids to maintain hydration.

Additionally, Gabriel did not appear dehydrated to either Nurse Burton or Mr. Shaffer. Gabriel was pink, moist, alert, and nontoxic appearing. An examination of the mucus membranes in Gabriel's throat and nose was normal. Gabriel was also not under any acute distress. Furthermore, Gabriel's vital signs were only slightly elevated which is otherwise consistent with a fever caused by an ear infection and gastroenteritis. Hence, the slightly elevated vital signs are not conclusive evidence of dehydration. Moreover, Mr. Shaffer's omission of a diagnosis of dehydration and omission of findings regarding Gabriel's fontanelle also indicate that Gabriel did not exhibit signs of dehydration. In addition, Mr. Shaffer's prescription of ORS packages to Plaintiff Tiffany Harris is not necessarily evidence that Mr. Shaffer believed Gabriel to be dehydrated since ORS packages and Pedialyte are commonly prescribed to <u>prevent</u> dehydration of an individual who is already sufficiently hydrated. Finally, it is interesting to note that Dr. Colwell, Plaintiffs' expert, could not definitively state that Gabriel was dehydrated when Mr. Shaffer examined him on March 19, 2005. In sum, Plaintiffs have not shown by the greater weight of the evidence that Gabriel was dehydrated when either Nurse Burton or Mr. Shaffer examined him on March 19, 2007. This finding is further buttressed by the fact that after Nurse Burton and Mr. Shaffer examined Gabriel neither Plaintiff Tiffany Harris nor Plaintiff Ambrose Lee observed any signs of dehydration the remainder of that day on March 19, 2005. Both Plaintiffs testified that Gabriel looked "normal," "pretty

healthy," and "pretty good" at the Gold Star.  Additionally, Gabriel was happy and laughing when Plaintiff Ambrose Lee played with him at the Gold Star.  Gabriel also was not fussy or feverish the afternoon of March 19, 2005 nor was there any definitive evidence of any additional diarrhea.  Furthermore, Gabriel continued to take liquids at least four times between 11:00 a.m. and 5:00 p.m. on March 19, 2005.

## CONCLUSIONS OF LAW

Plaintiffs bring this medical malpractice wrongful death lawsuit under the Federal Tort Claims Act, 28 U.S.C. §2671 *et seq*.  This Court has exclusive jurisdiction over this lawsuit under 28 U.S.C. §1346(b)(1).

A plaintiff in a medical malpractice lawsuit has the burden to show by the greater weight of the evidence that a healthcare provider breached "the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified [health care providers] practicing under similar circumstances, giving due consideration to the locality involved."  UJI 13-1101, NMRA 1998.  As the New Mexico Supreme Court has further explained:

> The healthcare provider is not required to guarantee a particular beneficial result. A poor medical outcome is not necessarily evidence of any wrongdoing. UJI 13-1112 NMRA 1998; *see also Cervantes*, 73 N.M. at 448, 389 P.2d at 213. Nor is the physician expected to practice with infallible accuracy, the most modern technology, or unexcelled expertise. *Cf. Snia v. United Med. Ctr.*, 637 So.2d 1290, 1294 (La.Ct.App.1994). The doctor's adherence to his or her duty is "evaluated in terms of reasonableness under the circumstances at the time, not in terms of results or in the light of subsequent events." *Id*.

*Alberts v. Schultz*, 1999-NMSC-015 ¶19, 126 N.M. 807, *rehearing denied*, No. 24,936 (1999).

The plaintiff must also prove by the greater weight of the evidence that the healthcare provider's

breach of this duty proximately caused a loss or damage to the plaintiff. *Id*. at ¶17.

Plaintiffs argue that if a child presents as they claim Gabriel did on the morning of March 19, 2005 with slightly elevated vital signs, an ear infection, gastroenteritis, and indications of dehydration brought on by diarrhea the healthcare provider has a duty to instruct the child's caregiver to either bring the child back for a recheck in 24 hours, observe the child for an extended period of time at the hospital, or give specific discharge instructions detailing signs of dehydration. Plaintiffs then argue that the breach of this duty by the Defendant proximately caused Gabriel to die of severe dehydration.

Accepting Plaintiffs' articulation of the duty that they contend Defendant breached, the Court observes that this duty necessarily includes a factual finding that the child was dehydrated or had symptoms that would have alerted a healthcare provider to developing dehydration when the healthcare provider examined the child. As discussed above, the greater weight of the evidence showed that on the morning of March 19, 2005, and even later that day, Gabriel was not dehydrated and at the time he was examined Gabriel's symptoms did not indicate that he was becoming dehydrated. Accordingly, Plaintiff have not proven by the greater weight of evidence that Defendant breached the duty articulated by Plaintiffs which assumes a finding of dehydration. Plaintiffs, therefore, have failed to carry their burden of proof in this medical malpractice case.

IT IS ORDERED that a judgment will be entered in favor of the Defendant.

_____
SENIOR UNITED STATES DISTRICT JUDGE